# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

     Plaintiff,

v.

Ikram Yusuf Mohamed, et al.,

     Defendants.

Case No. 24-cr-15 (NEB/DTS)

**ORDER & REPORT AND RECOMMENDATION**

## INTRODUCTION

This case—along with several others brought in this District—arises out of the Government's investigation into an alleged multi-million-dollar scheme to defraud federal child nutrition programs. Of the seven defendants charged in this case, four have filed motions to suppress and requested a hearing to review the validity of search warrants pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). For the reasons stated below, the Court recommends Defendants' motions to suppress be denied and denies Defendants' requests for a *Franks* hearing.

## FACTS[1]

### I. Background Information Regarding the Fraud Scheme

The federal government provides funding for various nutrition programs, including the Summer Food Service Program and Child and Adult Care Food Program.

---

[1] The facts are drawn from the challenged search warrant and accepted as true. Some conclusory statements and characterizations of the facts are also taken from the challenged warrants but are not accepted as true. *See United States v. Summage*, 481 F.3d 1075, 1077–78 (8th Cir. 2007) ("Conclusory statements made by affiants fail to give the issuing magistrate a substantial basis for determining that probable cause exists.").

Dkt. No. 194-1 ¶ 7 (Google Warrant). These federal child nutrition programs operate by reimbursing organizations that serve meals at sites. *Id.* ¶¶ 9–11, 13. State agencies administer the federal child nutrition programs by approving sites and claims for reimbursement. *Id.* ¶¶ 11–13. In Minnesota, the administering agency is the Minnesota Department of Education (MDE). *Id.* ¶ 12. Approved nonprofit organizations sponsor sites and submit claims for reimbursement to the MDE on behalf of those sites.

These reimbursements—federal child nutrition funds—are supposed to be used to provide nutritious meals and food to children and low-income individuals. *Id.* ¶¶ 13–14. However, certain United States Department of Agriculture waivers during the COVID-19 pandemic made the federal child nutrition programs vulnerable to abuse:

> Historically, the Federal Child Nutrition Program has generally functioned by providing meals to children involved in education-based programs or activities. During the Covid-19 pandemic, however, the USDA waived some of the standard requirements for participation in the Federal Child Nutrition Program. Among other things, USDA allowed for-profit restaurants to participate in the program. It also allowed for off-site food distribution to children outside of educational programs. At the same time, the state government's stay-at-home order and telework policies made it difficult to oversee the program. These changes left the program vulnerable to fraud and abuse.

*Id.* ¶ 15.

Feeding Our Future was an approved nonprofit organization that sponsored sites in Minnesota. *Id.* ¶ 16. During the COVID-19 pandemic, Feeding Our Future's claims for reimbursement skyrocketed. *Id.* ¶ 18. Feeding Our Future went from receiving approximately $3.4 million in federal child nutrition funds in 2019 to approximately $200

---

Although a few parties offer extrinsic evidence, such evidence will be considered when addressing the merits of Defendants' motions for a *Franks* hearing.

million in 2021. *Id.* ¶ 18. In 2022, more than 40 defendants connected to Feeding Our Future were indicted with participating in a scheme to defraud the federal child nutrition programs. *Id.* ¶ 22.

After one such defendant—a Feeding Our Future employee—pleaded guilty to participating in the fraud scheme, he provided investigators with information indicating that Ikram Yusuf Mohamed (another Feeding Our Future employee) "set up food distribution sites using her family members as proxies for the organizations." *Id.* ¶ 28.[2] As a part of the ongoing investigation, on May 12, 2023, the Government applied for and received two search warrants for six e-mail accounts connected to Ikram. *See* Dkt. No. 189-1 ¶ 4 (Yahoo Warrant); Google Warrant ¶ 4. Defendants challenge the search of four of those e-mail accounts here: amaden2@yahoo.com; inspiringyouthoutreach@gmail.com; stardistribution19@gmail.com; and unitedyouthofmpls@gmail.com. In support of its applications, the Government submitted lengthy affidavits of Federal Bureau of Investigation Special Agent Travis Wilmer. Those warrant affidavits largely overlap. *Compare* Yahoo Warrant ¶¶ 7–97, *with* Google Warrant ¶¶ 7–97. The following facts, drawn from Agent Wilmer's affidavits, are included in both warrant affidavits challenged here.

### A.     United Youth of MPLS LLC

Defendant Aisha Hassan Hussein (Aisha) created United Youth of MPLS LLC on December 8, 2020. Google Warrant ¶ 35. Aisha is Ikram's sister. *Id.* On December 9,

---

[2] Several defendants in this case share names with a co-defendant. For clarity and brevity, each defendant will be referred to by a name (first, middle, or last) that is unique to that defendant, i.e., a name that is not shared with any co-defendant in this case. The Court intends no disrespect by adopting this convention.

2020, Aisha applied to enroll two sites under the sponsorship of Feeding Our Future. *Id.* ¶ 37. Aisha submitted meal count sheets claiming the United Youth sites were each serving two meals a day to more than 1,000 children seven days a week. *Id.* ¶ 39. By May 2021, the United Youth sites each claimed to be serving two meals a day to more than 2,500 children. *Id.* United Youth claimed to have served more than 2 million meals between December 2020 and November 2021. *Id.* ¶ 41. Based on these claims, United Youth sought reimbursement for more than $4.9 million in federal child nutrition funds. *Id.* ¶ 42. Financial records demonstrated that most of the federal child nutrition funds received by United Youth were not used to serve meals. *Id.* ¶¶ 43–46. Instead, most of that $4.9 million went to shell companies owned by family members. *See, e.g.*, *id.* ¶ 45 ("Bank records show United Youth paid approximately $166,000 to Ikram['s] entity, IM Consultation LLC."), ¶ 43 ("Approximately $236,139.90 of United Youth claims was paid to Active Minds Youth, $1,894,200 to Star Distribution and $713,715.36 to Inspiring Youth.").

## B.    Inspiring Youth and Out Reach LLC

Abdisalam formed "inspiring youth & Out reach LLC." on February 2, 2021. Google Warrant ¶ 48.[3] Abdisalam is Ikram's husband. *Id.* The next day, on February 3, 2021, Abdisalam applied to enroll an Inspiring Youth site under the sponsorship of Feeding Our Future. *Id.* ¶ 49. From February 2021 through September 2021, Inspiring Youth shared a site with United Youth (i.e., operating at a United Youth site under a United Youth site ID). *Id.* ¶ 50. From September 2021 through November 2021 Inspiring Youth operated its own

---

[3] The name for Inspiring Youth is in quotation marks because that is the capitalization and spelling for the entity according to the Minnesota Secretary of State database.

site. *Id.* In February 2021, Abdisalam began submitting meal counts claiming that Inspiring Youth was serving two meals a day to more than 1,250 children seven days a week. *Id.* ¶ 52. By March 2021, Abdisalam was submitting meal counts claiming Inspiring Youth was serving more than 1,500 meals twice a day. *Id.* In total, Inspiring Youth claimed to have served over 700,000 meals between February 2021 and November 2021. *Id.* ¶ 53. Although Inspiring Youth received more than $1.5 million in federal child nutrition funds, *id.* ¶ 47, financial records indicated that those federal child nutrition funds were not used to supply food for children in need, *id.* ¶¶ 54–56. Rather, most of that money went to shell companies owned by family members, including Ikram. *See id.* ¶ 54 ("Bank records show [Inspiring Youth] paid Star Distribution LLC approximately $1,011,180.24 in 2021."), ¶ 55 ("Bank records show [Inspiring Youth] paid approximately $21,000 to Ikram Mohamed's entity, IM Consultation LLC.").

### C.    Youth International Club

Defendant Sahra Sharif Osman (Osman) formed Youth International Club on January 30, 2021. Google Warrant ¶ 58. On March 1, 2021, Osman applied to enroll two Youth International sites under the sponsorship of Feeding Our Future. *Id.* ¶¶ 59–60. In March 2021, Osman began submitting meal counts claiming that Youth International's sites were serving two meals a day to more than 1,300 children seven days a week. *Id.* ¶ 61. Youth International claimed to have served more than 650,000 meals between March 2021 and November 2021. *Id.* ¶ 62. Despite receiving roughly $1.4 million in federal child nutrition funds, *id.* ¶¶ 57, 63, bank records showed that Youth International purchased minimal amounts of food, *id.* ¶ 64. Rather, Youth International "paid more than $1.2 million to what appear to be shell companies created and used by coconspirators to

give the false impression that the companies were providing food." *Id.* Youth International also paid approximately $7,500 to IM Consultation LLC, a shell company created by Ikram. *Id.* ¶ 65.

### D.    Active Mind's Youth LLC

Defendant Fadumo Yusuf (Fadumo) formed Active Mind's Youth LLC on February 4, 2021. Google Warrant ¶ 72. Fadumo is Ikram's mother. *Id.* Active Mind did not apply for or receive approval from the MDE to operate as a site within the federal child nutrition programs. *Id.* ¶ 74. Instead, it submitted claims under various site identification numbers approved for other entities, including United Youth and Youth Development Foundation. *Id.* In March 2021, Fadumo began submitting meal counts claiming that Active Mind was serving more than 2,000 meals twice a day seven days a week. *Id.* ¶ 76. Despite receiving more than $1 million in federal child nutrition funds, *id.* ¶ 71, financial records indicated that those federal child nutrition funds were not used to serve meals, *id.* ¶¶ 77–84. Rather, most of the federal child nutrition funds received by Active Mind were transferred to shell companies that did not provide food and supplies commensurate with the payments received. *Id.* ¶ 78. For example, Active Mind paid $196,146 to Dua Supplies & Distribution Inc. *Id.* In turn, Dua Supplies paid $166,724.22 to Ikram's personal bank account. *Id.* ¶ 80. Active Mind also paid $38,500 to IM Consultation LLC. *Id.* ¶ 83.

### E.    Star Distribution LLC

Defendant Suleman Yusuf Mohamed (Suleman) formed Star Distribution LLC on February 18, 2021. Google Warrant ¶ 86. Suleman is Ikram's brother. *Id.* Unlike United Youth, Inspiring Youth, Youth International, and Active Mind, Star Distribution did not operate a site sponsored by Feeding Our Future. Rather, Star Distribution purportedly

supplied food to entities serving meals at sites. *Id.* ¶ 85. In turn, those entities transferred millions of dollars in federal child nutrition funds to Star Distribution; from February 2021 through April 2022, Star Distribution received approximately $10.2 million, primarily consisting of federal child nutrition funds. *Id.* ¶ 88. According to Agent Wilmer, Star Distribution's activities were inconsistent with a legitimate food distribution company. *Id.*

To start, Star Distribution lacked a location capable of housing a large-scale food distribution operation. *Id.* ¶ 90. Star Distribution was originally registered to Suleman's residential address. *Id.* Later, Star Distribution was registered to a business/industrial suite. *Id.* The suite did not appear to have been leased to or occupied by Star Distribution—the owner of that suite told investigators that he had never heard of Star Distribution or Suleman. *Id.*

Star Distribution's bank accounts also reflected patterns inconsistent with a legitimate food distribution company. *Id.* ¶ 88. Several instructive examples are listed in the warrant affidavits. *Id.* ¶ 93. Star Distribution paid roughly $1.7 million to Afro Produce, an entity that only delivered minimal amounts of food. *Id.* Star Distribution paid roughly $1.2 million to Suleman's personal bank account. *Id.* Star Distribution paid $820,000 to GAK Properties, an entity owned by Ikram's brother Defendant Gandi Yusuf Mohamed (Gandi). *Id.* Star Distribution paid $370,000 to GIF Properties, another entity owned by Gandi. *Id.* Gandi used the money to construct and remodel properties. *Id.* Star Distribution paid roughly $450,000 to Afrique Hospitality Group, *id.*, an entity whose CEO was indicted in 2022 for defrauding the federal child nutrition programs, *id.* ¶¶ 93–97. More than $500,000 in cash was withdrawn from Star Distribution's bank accounts. *Id.* Finally, Star Distribution paid $330,484 to IM Consultation. *Id.* ¶ 91.

## II.    E-mail Account Search Warrants

The warrant affidavits contain unique (i.e., non-overlapping) information regarding how Defendants used the e-mail accounts to be searched. *Compare* Yahoo Warrant ¶¶ 98–104, *with* Google Warrant ¶¶ 98–113. What follows is a summary of the unique facts relevant to Defendants' motions.

### A.    Amaden2@yahoo.com

Ikram used amaden2@yahoo.com account in connection with her employment at Feeding Our Future. Yahoo Warrant ¶ 99. For example, in June 2021, Aimee Bock (Bock), the executive director of Feeding Our Future, e-mailed Ikram a draft press release announcing that the MDE had been held in contempt of court for failing to process the reimbursement of federal child nutrition funds. *Id.* ¶ 100; *see also id.* ¶ 101 (describing two more e-mails between Bock and Ikram discussing the federal child nutrition programs). Ikram also used her e-mail account to communicate with Abdikerm Eidleh (Eidleh), Abdimajid Nur (Nur), and Haji Salad (Salad) regarding the federal child nutrition programs. *Id.* ¶¶ 102–104. This included transmitting a vendor contract and an admittance sheet. Bock, Eidleh, Nur, and Salad were indicted in 2022 for defrauding the federal child nutrition programs. *Id.* Amaden2@yahoo.com was also designated as the official e-mail address with the Minnesota Secretary of State for the following entities: United Youth, IM Consultation LLC, Active Mind, and Inspiring Youth. *Id.* ¶ 35.

### B.    Stardistribution19@gmail.com

Suleman used stardistribution19@gmail.com in connection with Star Distribution, including designating it as the official e-mail address with the Minnesota Secretary of State. Google Warrant ¶¶ 105–06. The e-mail account also appears on "countless

fraudulent invoices," *id.*, i.e., invoices for food purportedly supplied to United Youth, Inspiring Youth, Youth International, and Active Mind. In August 2021, Suleman used the account to e-mail Bock "a narrative related to the purported delivery of food." *Id.* ¶ 108.

### C.     Inspiringyouthoutreach@gmail.com

Abdisalam used inspiringyouthoutreach@gmail.com in connection with Inspiring Youth sites sponsored by Feeding Out Future. Google Warrant ¶¶ 111–13. The e-mail account was listed on Feeding Our Future forms for Inspiring Youth sites. *See id.* ¶ 111 (embedding a Feeding Our Future form to authorize home meal deliveries). Abdisalam also used the e-mail account to communicate with Feeding Our Future, such as by submitting meal count sheets along with other documentation to support claims for reimbursement. *Id.* ¶ 112 (meal count sheet for February 2021), ¶ 113 (meal count sheet for June 2021).

### D.     Unitedyouthofmpls@gmail.com

Aisha used unitedyouthofmpls@gmail.com in connection with United Youth sites sponsored by Feeding Our Future. Google Warrant ¶ 98. For example, in February 2021, Aisha used the e-mail account to submit a meal count sheet to Feeding Our Future. *Id.* ¶ 99. Similarly, in May 2021, Aisha used the e-mail account to send Feeding Our Future menus, invoices, attendance rosters, and meal count sheets to substantiate United Youth claims for reimbursements. *Id.* ¶ 100. That e-mail included an attached invoice purporting to show that United Youth owed Star Distribution roughly $40,000 for the purchase of food supplies. *Id.* In June 2021, Aisha sent several additional invoices from Star Distribution to Bock. *Id.*

E.    Attachments B

Abdisalam challenges Attachment B to the May 12, 2023 search warrant for inspiringyouthoutreach@gmail.com. Attachment B describes the particular things to be seized from Abdisalam's e-mail account, following the two-step procedure set forth in Federal Rule of Criminal Procedure 41. Under Rule 41, the Government may collect a broader set of data from an individual's electronic database, including an e-mail account, and then conduct a second search of that data to seize a relevant subset of information identified by the search warrant. Attachment B first directed Google to provide the Government with the contents of all e-mails associated with the accounts (among other data) for the period of January 1, 2020, to the present. Google Warrant at 65.

The data to then be seized by the Government included: (1) all the information that constituted fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. §§ 1341, 371, 666, 1956, and 1957, involving several entities and individuals targeted by the Government's investigation; (2) any records or communications related to the creation of rosters or attendance lists; (3) communications with Feeding Our Future and certain government entities; (4) communications or records related to sites participating in the federal child nutrition programs; (5) records related to distribution of federal child nutrition funds; (6) records or communications related to education programs or serving of food to children; (7) records related to purchases made with federal child nutrition funds; (8) records or communications related to "obtaining, secreting, transfer, and/or concealment of money"; (9) records related to payment from sites under sponsorship of Feeding Our Future to and from Feeding Our Future employees; (10) records related to who created, used, or communicated with the e-mail accounts; (11) evidence indicating how and when

the e-mail accounts were used; (12) "all e-mails indicating the e-mail account owner's state of mind as it relates to the crime under investigation"; (13) e-mails that identified co-conspirators; and (14) e-mails which evidenced the planning and execution of the fraud scheme. Google Warrant at 66–68.

## ANALYSIS

Defendants' motions will be addressed on an issue-by-issue basis in the following order: (1) absence of probable cause (four-corners review); (2) the first requirement for a *Franks* hearing (whether Agent Wilmer made a knowingly false statement or reckless omission); (3) the second requirement for a *Franks* hearing (whether the supporting affidavits lack probable cause with the false statements corrected and missing information inserted); (4) particularity and overbreadth; and (5) the good-faith exception.

## I.      Probable Cause (Four-Corners Review)

Defendants move to suppress based on a four-corners review, arguing that the search warrants failed to establish probable cause. "Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances." *United States v. Notman*, 831 F.3d 1084, 1088 (8th Cir. 2016). When the judge issuing a search warrant relied solely upon the supporting affidavit, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014) (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)). When conducting a four-corners review, the Court must determine whether the warrant sets forth "sufficient facts to lead a prudent person to believe that there is a fair probability

that contraband or evidence of a crime will be found in a particular place" *Notman*, 831 F.3d at 1088.

Reviewing courts must afford "great deference" to the probable cause determination of the judge who issued the warrant and should resolve even "doubtful or marginal cases" in favor of a warrant's validity. *United States v. Butler*, 594 F.3d 955, 962 (8th Cir. 2010) (citation omitted); *see United States v. Ventresca*, 380 U.S. 102, 109 (1965). So long as the issuing judge had a "substantial basis" for concluding the "search would uncover evidence of wrongdoing," this Court must uphold the probable cause determination. *United States v. Horn*, 187 F.3d 781, 785 (8th Cir. 1999). Accordingly, courts take a common-sense approach to examining the sufficiency of warrant affidavits. However, a warrant issued based only on a supporting affidavit that merely asserts conclusions rather than facts may be invalid. *Aguilar v. Texas*, 378 U.S. 108, 113 (1964).

### A.    Ikram Yusuf Mohamed (Dkt. No. 188)

Ikram moves to suppress evidence from the May 12 warrant for her e-mail account, contending that the supporting affidavit fails to set forth probable cause. Dkt. No. 188.

The warrant affidavit offers more than enough facts to conclude Ikram and her family members knowingly caused the submission of false claims for reimbursement. Just consider the following core facts: (1) United Youth applied to operate two sites the day after its creation; (2) a few months later, Ikram's family members created three new entities (Inspiring Youth, Youth International, and Active Mind) to participate in the federal child nutrition programs; (3) each of these entities claimed to be serving thousands of meals every day seven days a week shortly after their creation; (4) Inspiring Youth claimed to be serving meals at one of United Youth's sites for seven months after its

12

formation; (5) Active Mind never formally enrolled in the federal child nutrition programs at all, instead claiming reimbursement under the site identification numbers that belong to other approved sites; (6) then Suleman, Ikram's brother, created Star Distribution, an entity that purported to distribute millions of dollars in food despite lacking an office or warehouse; (7) despite the enormous volume of meals these entities claimed to be serving, bank records showed that only a small amount of the federal child nutrition funds were spent on food; and (8) Ikram and her family transferred millions of dollars in federal child nutrition funds to themselves through these newly created entities. Simply put, these facts, when considered together, are powerful evidence that Ikram and her family members knowingly caused the submission of false claims for reimbursement.[4]

Ikram counters by taking aim at several portions of the warrant affidavit, claiming that once these conclusory allegations are cut away, the affidavit fails to establish probable cause. Dkt. No. 188 at 2, 5. First, Ikram contends that no weight should be given to the affidavit's reliance on a Feeding Our Future informant because the tip is unreliable. *Id.* at 3–5. Not so. Reliability can be established through independent corroboration. *United States v. Faulkner*, 826 F.3d 1139, 1145 (8th Cir. 2016). Here, as is readily apparent from the core facts summarized above, the Government's investigation corroborated the informant's claim that Ikram participated in the fraud scheme by setting up food distribution sites using her family members. Regardless, the warrant affidavit contains more than enough facts to establish probable cause without relying on the tip.

---

[4] Ikram does not allege there is an insufficient nexus between the fraud scheme and her e-mail account. *See* Dkt. No. 188 at 2–7. Therefore, the Court declines to analyze that issue here.

Second, Ikram contends that the affidavit's repeated characterization of payments to her as kickbacks is conclusory. Dkt. No. 188 at 4–5. The Court is not convinced. Agent Wilmer describes how Feeding Our Future solicited and received kickbacks by requiring individuals operating fraudulent sites to kick back a portion of their fraudulent proceeds to Feeding Our Future employees. Yahoo Warrant ¶ 21. Moreover, regardless of how Agent Wilmer characterized these payments, the newly created entities funneled federal child nutrition funds to Ikram (rather than using the funds to serve meals). Thus, the payments to Ikram—regardless of how they are characterized—are facts supporting probable cause.

Third, Ikram argues that the affidavit's allegations regarding Star Distribution are conclusory. Dkt. No. 188 at 5–6. For example, she takes issue with the representation that Star Distribution "was an entity used as a part of the fraud scheme to make it appear as if food and related supplies were being purchased for the food program. However, the investigation shows that the money was laundered through the Star Distribution LLC bank account." *Id.* Alone, these statements might be conclusory. But the affidavit offers plenty of supporting detail. For example, the warrant affidavit summarizes millions of dollars in transactions that are inconsistent with purchasing food, including withdrawing more than $500,000 in cash, transferring more than $2 million to Ikram's brothers, transferring more than $300,000 directly to Ikram, and transferring another $250,000 indirectly to Ikram. Yahoo Warrant ¶¶ 93–97. Simply put, when examined in context, the warrant affidavit's allegations regarding Star Distribution are not conclusory.

Ikram also takes issue with Agent Wilmer's summary of payments from Star Distribution to Afro Produce. The affidavit states, "[i]nvestigation has shown that invoices

are purchased from Afro Produce for a percent of the overall value of the invoice and minimal food is delivered." Yahoo Warrant ¶ 93. Ikram contends that this allegation is completely unsupported. According to Ikram, "the $1.6 million paid to Afro Produce is not merely supported by invoices from Afro Produce; it is reflected in the movement of money from Star's bank accounts to those of Afro Produce. The money was actually paid, and presumably, food was actually supplied." Dkt. No. 188 at 6. Not so. The at-issue statement is factual, not conclusory. If the Government's investigation had shown, for example, that Afro Produce delivered substantial amounts of food, then that would be a *Franks* issue. Nor was Agent Wilmer required to describe the evidentiary support for every factual assertion in his lengthy warrant affidavit. At most, the absence of further supporting detail goes to the weight of Agent Wilmer's assertion when evaluating probable cause. Given the wealth of detail in the warrant affidavit, the weight of the at-issue statement is a drop in the probable-cause bucket. Moreover, the statement regarding Afro Produce must be considered in context, including Agent Wilmer's assertion that a core part of the fraud scheme was to create shell companies and transfer funds using falsified invoices to support fraudulent claims for reimbursement. *See* Yahoo Warrant ¶¶ 67–69, 82, 90 (describing the use of false invoices).

Fourth and finally, Ikram argues Agent Wilmer fails to mention that Star Distribution paid nearly half a million dollars to plainly legitimate food vendors such as Costco and Sam's Club. Dkt. No. 188 at 7. That is irrelevant when conducting a four-corners review. When the issuing judge relied solely upon the warrant affidavit, only the information found within the four corners of the affidavit may be considered. *United States v. Solomon*, 432

F.3d 824, 827 (8th Cir. 2005). Alleged omissions will be addressed in the context of Defendants' requests for a *Franks* hearing.

### B.    Shakur Abdinur Abdisalam (Dkt. No. 193)

Abdisalam challenges the May 12 search warrant for inspiringyouthoutreach@gmail.com, arguing that the supporting affidavit fails to set forth probable cause. Dkt. No. 194 at 2–9.

To start, the warrant affidavit offers sufficient factual content to make it fairly likely that Abdisalam was an active participant in the fraud scheme. Abdisalam, Ikram's husband, created Inspiring Youth on February 2, 2021, applying to enroll in the federal child nutrition programs under the sponsorship of Feeding Our Future the next day. Google Warrant ¶¶ 48–49. Abdisalam was a signatory on the company's bank accounts and submitted Inspiring Youth's meal count sheets. *Id.* ¶¶ 51–52. Inspiring Youth transferred most of the federal child nutrition funds it received to Star Distribution. *Id.* ¶ 54. This is more than enough to link Abdisalam to the fraud scheme. *See* Supra, Part I.A (summarizing facts sufficient to demonstrate the existence of a fraud scheme and Inspiring Youth's role in the fraud scheme).

Other facts in the affidavit outline a sufficient nexus between the fraud scheme and the e-mail account, inspiringyouthoutreach@gmail.com. Abdisalam used the e-mail account to submit signed, fraudulent claims for reimbursement to Feeding Our Future. Google Warrant ¶¶ 112–13. Abdisalam also used the e-mail account on Feeding Our Future forms related to Inspiring Youth's site and to otherwise communicate with Feeding Our Future. *Id.* ¶¶ 111, 113. When these e-mails are taken in context of the affidavit's thorough description of the fraud scheme, it is fairly likely that these e-mails evidence

Abdisalam's participation in the scheme. That is more than enough to establish probable cause. *See United States v. Miller*, No. 20-cr-232, 2022 WL 3644894, at *3 (D. Minn. Aug. 24, 2022) (describing how a link between the use of an e-mail account and a larger fraud scheme is sufficient to establish probable cause); *United States v. Moulder*, No. 20-cr-232, 2022 WL 4001207, at *6 (D. Minn. May 31, 2022), *R. & R. adopted by* 2022 WL 4000203 (D. Minn. Sept. 1, 2022) ("The references to Defendant Moulder and her email account cannot be taken out of context but read along with the totality of circumstances described in the affidavit[.]").

Abdisalam, like Ikram, responds by contending that various allegations in the warrant affidavit are conclusory. Dkt. No. 194 at 3–9. For example, Abdisalam takes aim at Agent Wilmer's assertion that Abdisalam submitted false meal counts to support fraudulent claims for reimbursement. Alone, this statement might be conclusory. But the warrant affidavit offers more than enough detail to establish Inspiring Youth's role in the fraud scheme, including that (1) Inspiring Youth claimed to be delivering two meals a day to more than 1,250 children seven days a week; (2) Inspiring Youth operated out of a United Youth site for seven months; (3) Inspiring Youth's financial records were inconsistent with serving the volume of meals claimed; and (4) Inspiring Youth transferred more than $1 million in federal child nutrition funds to Star Distribution (a shell company controlled by a family member). Google Warrant ¶¶ 47–56.

Abdisalam also takes issue with Agent Wilmer's characterization of payments from Inspiring Youth to Ikram as bribes or kickbacks. Dkt. No. 194 at 6–7. Again, this is not persuasive. Not only does the warrant affidavit describe an alleged kickback scheme, Google Warrant ¶ 21, but what matters is that Inspiring Youth funneled federal child

nutrition funds to Ikram (rather than using the funds to provide meals). Inspiring Youth's payment of federal child nutrition funds to Ikram, Google Warrant ¶ 55, is a fact relevant to probable cause. Simply put, the warrant affidavit includes more than enough facts to make it fairly likely that evidence of a crime—a scheme to defraud the federal child nutrition programs—would be found on inspiringyouthoutreach@gmail.com.

### C.    Suleman Yusuf Mohamed (Dkt. No. 207)

Suleman moves to suppress evidence from the May 12 warrant for stardistribution19@gmail.com based on the absence of probable cause. Dkt. No. 209 at 4.

The warrant affidavit contains enough factual content to link Suleman to the fraud scheme. Suleman, Ikram's brother, created Star Distribution on February 18, 2021, registered to Suleman's residential address. Google Warrant ¶¶ 86, 90. He opened a bank account for Star Distribution on February 25, 2021, and then opened a second bank account on February 26. *Id.* ¶ 87. Hundreds of thousands of dollars in federal child nutrition funds quickly began flowing into Star Distribution's bank accounts. *See id.* ¶ 88. Star Distribution only spent a small amount of this money on food, instead transferring millions of dollars in federal child nutrition funds to Suleman and his family. *Id.* ¶¶ 88–93. This included transferring more than $1.2 million to Suleman's personal bank account and withdrawing more than $500,000 in cash. *Id.* ¶ 93. These facts are more than enough to make it fairly likely that Suleman—through Star Distribution—actively participated in

the fraud scheme. *See* Supra, Part I.A (summarizing facts sufficient to demonstrate the existence of a fraud scheme and Star Distribution's role in the fraud scheme).[5]

Suleman's counter-arguments are identical to Ikram's: (1) that the tip from a Feeding Our Future informant is unreliable; (2) that the warrant affidavit's repeated characterization of payments to Ikram as kickbacks is conclusory; (3) that the affidavit's allegations regarding Star Distribution are conclusory; and (4) that Agent Wilmer failed to mention that Star Distribution paid nearly half a million dollars to legitimate food vendors such as Costco and Sam's Club. Dkt. No. 209 at 2–7. The Court disagrees for the reasons discussed above. Supra, Part I.A.

### D.    Aisha Hassan Hussein (Dkt. No. 214)

Aisha moves to suppress evidence from the May 12 warrant for unitedyouthofmpls@gmail.com based on the absence of probable cause. Dkt. No. 214 at 2–6.

To start, the warrant affidavit contains plenty of facts linking Aisha to the fraud scheme. Aisha, Ikram's sister, created United Youth on December 9, 2020, enrolling two sites under the sponsorship of Feeding Our Future the next day. Google Warrant ¶¶ 35, 37. Shortly after its creation, United Youth claimed to be serving thousands of meals a day. *Id.* ¶¶ 39–41. Despite receiving more than $4.9 million for purportedly serving more than 2 million meals (in less than a year), United Youth did not spend most of its money serving meals, instead transferring millions of dollars to shell companies owned by family members. *Id.* ¶¶ 41–46. Because Aisha was the sole signatory on United Youth's bank

---

[5] Suleman does not argue that there is an insufficient nexus between the fraud scheme and stardistribution19@gmail.com. *See* Dkt. No. 209 at 2–7. Therefore, the Court declines to analyze that issue here.

account, *id.* ¶ 36, it is reasonable to infer that Aisha executed these transfers. This is more than enough to link Aisha to the fraud scheme. *See* Supra, Part I.A (summarizing facts sufficient to demonstrate the existence of a fraud scheme and United Youth's role in the fraud scheme).[6]

Aisha offers the same four-corners arguments as Ikram and Suleman. *Compare* Dkt. No. 188 at 2–7 and Dkt. No. 209 at 2–7, *with* Dkt. No. 214 at 2–6. The Court's rejection of those arguments is discussed above. Supra, Part I.A.

In summary, because the warrant affidavits establish ample probable cause to search the at-issue e-mail accounts, the Court recommends Defendants' motions to suppress be denied.

## II.    *Franks* Hearing: First Requirement

Defendants move for a hearing to review the validity of search warrants pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* allows criminal defendants to "request a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination." *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). If the issuing judge's probable cause determination was based on such an affidavit, the search warrant may be invalid. *United States v. Conant*, 799 F.3d 1195, 1199 (8th Cir. 2015) (quoting *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001)). To receive a *Franks* hearing, a defendant must make a substantial preliminary showing that (1) the affidavit contained a false statement (or omission) made either knowingly or with reckless

---

[6] Aisha does not argue that there is an insufficient nexus between the fraud scheme and unitedyouthofmpls@gmail.com. *See* Dkt. No. 214 at 2–7. Therefore, the Court declines to analyze that issue here.

disregard for the truth; and (2) with the false statement corrected and missing information inserted, the affidavit no longer establishes probable cause for the search. *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015).

This preliminary showing requires defendants to "offer specific allegations along with supporting affidavits or similarly reliable statements." *Id.* "A Franks hearing must be denied unless the defendant makes a strong initial showing of deliberate falsehood or reckless disregard of the truth." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010). "In determining if an affiant's statements were made with reckless disregard for the truth, the test is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011). "Allegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171. For omissions, recklessness "may be inferred from the omission of information from an affidavit only when the material omitted would have been clearly critical to the finding of probable cause." *United States v. Carnahan*, 684 F.3d 732, 735 (8th Cir. 2012) (quoting *United States v. Smith,* 581 F.3d 692, 695 (8th Cir. 2009)); *see also United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (finding an officer acted recklessly by withholding information that a "reasonable person would have known . . . was the kind of thing the judge would wish to know"). This section addresses only the first requirement to receive a *Franks* hearing—whether Defendants have made a substantial showing that Agent Wilmer made a knowing or reckless false statement or omission in the challenged supporting affidavits.

A.      Ikram Yusuf Mohamed (Dkt. No. 188)

Ikram requests a *Franks* hearing, challenging the validity of the May 12, 2023 search warrant for her e-mail account. Dkt. No. 188 at 8–26. She identifies three categories of false statements or omissions. First, Ikram argues that the warrant affidavit omitted facts regarding COVID-19 era waivers and misrepresented program rules. *Id.* at 11–19. Second, she contends that the affidavit misrepresented Star Distribution's payments by omitting/falsely characterizing $2.5 million paid to "known food vendors." *Id.* at 20. Third, she contends that Agent Wilmer recklessly omitted video and photographic evidence showing the distribution of food. *Id.* at 20–22.

1.      COVID-19 Era Waivers and Program Rules

Ikram contends that the warrant affidavit omitted important details regarding the federal child nutrition programs during the COVID-19 pandemic that undermine Agent Wilmer's narrative of fraud. Dkt. No. 188 at 13. First, she points to COVID-19 era waivers that allowed sites to package multiple meals to be provided at one time in bulk. *Id.* at 14–17. According to Ikram, these waivers make it plausible that United Youth, Inspiring Youth, Youth International, and Active Mind distributed the large number of meals they claimed to have served. *Id.*

But Ikram does not present affidavits or other reliable evidence that Agent Wilmer deliberately or recklessly omitted information regarding the waivers. And recklessness may be inferred only when omitted information was clearly critical to the finding of probable cause. *Carnahan*, 684 F.3d at 735 (describing the standard as rigorous). An example is instructive. In *U.S. v. Jacobs*, a drug dog showed interest in a package by pushing it around, but this action did not amount to an official alert, 986 F.2d 1231, 1233

22

(8th Cir. 1993). In a warrant application, the officer "informed the magistrate judge that the dog had shown an interest in the Jacobs package, but neglected to include . . . that no alert had occurred." *Id.* at 1234. The Eighth Circuit Court of Appeals found this omission to be reckless because "[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know." *Id.* at 1235. The difference between *Jones* and this case is stark. In *Jones*, the dog sniff was the main basis to search the package. Here, the implausibility of the large meal counts is one of many pieces of circumstantial evidence. In *Jones*, the absence of an alert cut clearly against the likelihood of finding drugs in the package. Here, the link is much more attenuated. The waivers might have allowed the sites—operated by United Youth, Youth International, Inspiring Youth, and Active Mind—to deliver more food. But even assuming that those entities served meals and made use of these waivers, at best this makes the incredibly high number of meals these sites claimed to be serving slightly more plausible. That the issuing magistrate judge could have found the omitted waivers somewhat relevant is not enough to infer recklessness. *See Tech. Ordnance, Inc. v. United States*, 244 F.3d 641, 650 (8th Cir. 2001) ("A law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not.").

Second, Ikram argues that Agent Wilmer recklessly omitted Star Distribution's right to make a profit by supplying food to entities serving meals at sites. *Id.* at 17–19. By failing to clarify that Star Distribution could earn a profit supplying food, Ikram claims, Agent Wilmer perpetuated a misleading narrative regarding Star Distribution's transfer of federal child nutrition funds to family members. *Id.* at 19. According to Ikram, Star Distribution's

ability to make a profit was information that any reasonable law enforcement officer would know that an issuing judge would want to know. *Id.* at 23. The Court disagrees.

At bottom, the omitted statement—that Star Distribution was entitled to make a profit—was not clearly critical to probable cause. Star Distribution could make a profit, but only by actually supplying food. The heart of this case is that Ikram and her family members claimed reimbursement for meals never served. *See* Yahoo Warrant ¶ 19. Star Distribution's role in that scheme, according to Agent Wilmer, was laundering fraudulently obtained federal child nutrition funds. *Id.* ¶ 89. Several core facts in the warrant affidavit tend to show that Ikram and her family falsely represented the number of meals that were served. *See* Supra, Part I.A. One of those core facts is the millions of dollars of federal child nutrition funds Ikram and her family transferred to themselves. That Star Distribution might have been able to earn these federal child nutrition fund as a profit does little to undermine this fact, let alone the totality of Agent Wilmer's affidavit. After all, the warrant affidavit included plenty of facts supporting its assertion that Star Distribution was not a legitimate food distribution company and did not purchase substantial amounts of food. *See* Yahoo Warrant ¶¶ 86, 88–93. Because the omission of Star Distribution's entitlement to earn a profit was not clearly critical to probable cause, there is no valid basis to infer that Agent Wilmer's omission of that fact was reckless.

### 2.    Star Distribution's Purchases of Food

Ikram raises two main *Franks* arguments related to Star Distribution's alleged purchases of food. First, Ikram argues that the Government dismissed "nearly $2 million paid to Afro Produce and Afrique Hospitality Group because those entities were allegedly involved in the fraud." Dkt. No. 188 at 20. Without evidence to demonstrate those

payments were for food, Ikram claims, "there is no basis for the magistrate judge to credit these payments as being for food." *Id.* This argument ignores the *Franks* hearing standard. To receive a *Franks* hearing, a criminal defendant must make a "a strong initial showing of deliberate falsehood or reckless disregard of the truth." *Freeman*, 625 F.3d at 1052. In the warrant affidavit, Agent Wilmer claims those entities were not legitimate food suppliers. *See* Yahoo Warrant ¶¶ 93–97. Ikram makes no effort to show Agent Wilmer's claims were false, for example, by submitting evidence that Afro Produce and Afrique Hospitality Group were legitimate food suppliers, let alone demonstrate Agent Wilmer knew those claims were false and nonetheless included them in the warrant affidavits. Mere allegations of falsehood are not enough. *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015) ("This substantiality requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements."); *see also United States v. Kattaria*, 553 F.3d 1171, 1177 (8th Cir. 2009) (finding mere allegations insufficient).

Second, Ikram argues that Agent Wilmer failed to mention that Star Distribution spent $480,695 on food. Dkt. No. 188 at 20. This argument fares no better. To start, Ikram cites a one-page document summarizing transfers to and from Star Distribution's bank account. *See* Dkt. No. 189-2. That document includes a line item for "Food Expense" in the amount of $480,695.05. *Id.* The origin of the summary document is unclear. And that the roughly $480,000 cited in this document consists of legitimate food purchases is not certain. Even assuming Ikram's characterization of the document to be true, that does not necessarily mean the food was used to serve meals. In short, the one-page summary

document is insufficient to reliably establish the factual basis upon which Ikram's argument is premised.

Regardless, even assuming Star Distribution purchased roughly $480,000 in food from legitimate vendors, there is a familiar problem—there is no valid basis to infer recklessness because the omitted information was not clearly critical to probable cause.[7] The Government's theory is not that Star Distribution purchased no food. Rather, the thrust of the warrant affidavit is that Star Distribution did not purchase and supply food "commensurate with the payments received from these various sites[.]" Yahoo Warrant ¶ 90. Ikram and her family claimed to have served millions of meals. Star Distribution received more than $10 million—almost entirely consisting of federal child nutrition funds—based on claims for reimbursement from sites operated by United Youth, Inspiring Youth, Youth International, and Active Mind. That Star Distribution spent less than five percent of this $10 million on food does little to undercut Agent Wilmer's assertion that Star Distribution was not a legitimate food vendor, let alone the warrant affidavit taken as a whole. Simply put, Agent Wilmer's omission of Star Distribution's food purchases was reasonable. *See Tech. Ordnance, Inc.* 244 F.3d at 650 ("A law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not.").

### 3.    Video and Photographic Evidence

Finally, Ikram argues that Agent Wilmer omitted video and photographic evidence showing food being distributed at sites operated by United Youth, Inspiring Youth, and

---

[7] Ikram makes no other showing, in the form of affidavits or other reliable evidence, that the omission of this information was reckless or deliberate.

Active Mind. Dkt. No. 188 at 20–22; *see also* Ikram Decl. ¶¶ 2–3, Dkt. No. 190. According to Ikram, these videos and photographs depict "long lines of parents waiting to pick up food for their children at the United Youth site; hundreds of bags assembled with food for the week, ready for pick up; a temporary shelter under which food bags were being distributed; a refrigerator truck filled with hundreds of gallons of milk; and a small boy pulling a wagon filled with food through the snow." *Id.* Ikram sent those videos to Bock "to keep her apprised of the activities at the food sites." *Id.* at 21. Because the Government executed a search warrant authorizing the seizure of Bock's cell phones in January 2022, Ikram contends Agent Wilmer should have been aware of the videos before applying for the May 12, 2023 search warrant for amaden2@yahoo.com.

There are two main problems with this line of attack. First, Ikram has not adequately shown that Agent Wilmer was aware of the videos and photographs. The Government represents that it seized "nearly 200 devices in the Feeding Our Future investigation whose collective contents are nearly 8TB in size." Gov.'s Resp. 40, Dkt. No. 241. According to the Government, it only exhaustively analyzed devices when necessary. *Id.* That the Government—and by extension Agent Wilmer—possessed a few photographs and videos in an 8-terabyte haystack does little to demonstrate the information was deliberately or recklessly omitted from the warrant affidavit.

Second, Ikram has not adequately shown that these photographs and videos were clearly critical to probable cause. Having reviewed the photograph and video footage, the basic problem is that the evidence does not decisively favor either Ikram or the Government. On one hand, Ikram can argue that the photographs and video footage are evidence that food was purchased and meals were served. But the Government can

counter that this smattering of evidence does not show nearly as many meals being served as United Youth, Inspiring Youth, Youth International, and Active Mind claimed for reimbursement. After all, the core of the Government's case is not necessarily that these entities served no meals, but that they served only a fraction of the meals they claimed for reimbursement. *See, e.g.*, Yahoo Warrant ¶¶ 78, 90. Moreover, Agent Wilmer would have had plenty of reason to be skeptical of evidence selectively sent to Bock given the warrant affidavit's description of various efforts taken to cover up the fraud scheme. Without something more, evidence that some meals were served does little to undercut the warrant affidavit. Because the evidence cuts both ways, it would not have been clearly critical to a finding of probable cause, and there is no valid basis to infer that Agent Wilmer's omission of the photographs and videos was reckless.

In summary, none of Ikram's specified statements or omissions pass the first hurdle to receive a *Franks* hearing; she has failed to make the required substantial showing that Agent Wilmer made a knowing or reckless false statement or omission.

### B.    Shakur Abdinur Abdisalam, Aisha Hassan Hussein, and Suleman Yusuf Mohamed (Dkt. Nos. 193, 208, 214)

Abdisalam, Aisha, and Suleman raise the same *Franks* arguments as Ikram. *Compare* Dkt. No. 188 at 8–25, *with* Dkt. No. 194 at 16–33, Dkt. No. 209 at 7–23, and Dkt. No. 214 at 6–24. Therefore, none of these defendants' specified statements or omissions pass the first hurdle to receive a *Franks* hearing for the reasons discussed in Part II.A.

### III.    *Franks* Hearing: Second Requirement

There are two requirements to receive a *Franks* hearing: a defendant must make a substantial preliminary showing that (1) the warrant affidavit contained a false statement

(or omission) made either knowingly and intentionally, or with reckless disregard for the truth; and (2) with the false statement corrected or missing information inserted, the affidavit no longer establishes probable cause for the search. *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). That none of Defendants' motions for a *Franks* hearing satisfy this first requirement is sufficient to deny the motions. Nonetheless, it is worth explaining why the affidavits would continue to establish probable cause even after correcting allegedly false statements and inserting identified omissions.

### A.     Ikram Yusuf Mohamed (Dkt. No. 188)

To recap, Ikram's motion for a *Franks* hearing identifies the omission of COVID-19 waivers, Star Distribution's entitlement to earn a profit, Star Distribution financial records indicating it purchased food, photographs, and video footage, along with allegedly false statements related to these omissions.

Having already explained why none of the omitted information is clearly critical to probable cause, *see* Supra, Part II.A, it follows that inserting the omitted information does not negate the existence of probable cause. The omitted COVID-19 waivers rules only slightly undermine a few of the core facts in Agent Wilmer's affidavit. *See* Supra, Part I.A (outlining core facts that make it fairly likely that Ikram and her family knowingly caused the submission of false claims). Between the fake invoices, suspiciously large and uniform meal counts, rapid expansion of new sites, and web of shell companies transferring millions of dollars of federal child nutrition to family members, and so on, there would still be more than enough to establish probable cause even if inserting the COVID-19 waivers made the incredibly large claims for reimbursement slightly more plausible. The same is true if the affidavit clarified that Star Distribution could make a profit. That Star Distribution

could legally make a profit does not undermine probable cause given the circumstantial evidence indicating fraudulent claims for reimbursement and Star Distribution's role in that fraud scheme. *See* Supra, Parts I.A, C.

The omission of Star Distribution's purchase of roughly $480,000 in food from legitimate vendors represents only a fraction of Star Distribution's debits. That is not inconsistent with the warrant affidavit, let alone enough move the needle on probable cause. As for photographs and video footage, those omissions could reasonably be interpreted to cut either way. The submitted evidence shows some meals being served, but not enough to substantiate the thousands of meals each entity claimed to be serving every day. Because the affidavit establishes probable cause even after correcting the alleged deficiencies, Ikram's motion does not satisfy the second requirement to receive a *Franks* hearing. Having failed to meet either requirement for a *Franks* hearing, Ikram's motion is denied.

### B.    Shakur Abdinur Abdisalam, Aisha Hassan Hussein, and Suleman Yusuf Mohamed (Dkt. Nos. 193, 208, 214)

Again, Abdisalam, Aisha, and Suleman raise the same *Franks* arguments as Ikram. *Compare* Dkt. No. 188 at 8–25, *with* Dkt. No. 194 at 16–33, Dkt. No. 209 at 7–23, and Dkt. No. 214 at 6–24. Therefore, because the warrant affidavit establishes probable cause even after correcting the alleged deficiencies, their motions likewise do not satisfy the second requirement for a *Franks* hearing for the reasons discussed in Part III.A. Abdisalam's, Aisha's, and Suleman's motions for a *Franks* hearing are denied.

### IV.    Particularity and Overbreadth

Abdisalam challenges the May 12 search warrant for his e-mail search warrants as overly broad and insufficiently particular. Dkt. No. 194 at 9–16. The Fourth Amendment

provides that "no Warrants shall issue . . . [unless] particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The purpose of this particularity requirement is to prevent "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). To be sufficiently particular, the warrant application must describe the items to be seized with enough detail that "the searcher [can] locate and identify the places and items with reasonable effort and [] avoid mistakenly searching the wrong places or seizing the wrong items." *United States v. Gleich*, 397 F.3d 608, 911 (8th Cir. 2005). Courts evaluate particularity for "practical" not "hypertechnical" accuracy. *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011). Particularity depends in part on the nature of the investigated crimes. *See United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988); *United States v. Cooper*, 654 F.3d 1104, 1127 (10th Cir. 2011); *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001). This approach comports with the totality-of-the-circumstances test for probable cause in general. *See Notman*, 831 F.3d at 1088.[8]

Abdisalam contends that the e-mail search warrant "is so broad in its scope in terms of the timeframe it covered and the content it seized, that it amounts to a forbidden General Warrant." Dkt. No. 194 at 9. The Government's search-warrant application follows Rule 41(e)(2)(B)'s two-step procedure. At step one, the warrant directed Google to turn over Abdisalam's e-mail account. Google Warrant at 65. At step two, the

---

[8] Overbreadth is the requirement that the scope of the warrant be limited by probable cause. *United States v. Brown*, No. 19-cr-110, 2019 WL 7838276, at *11 (D. Minn. Sept. 20, 2019), *R&R adopted,* No. 19-cr-110, 2019 WL 6607240, at *11 (D. Minn. Dec. 5, 2019). Particularity and overbreadth are distinct but intertwined concepts that are often addressed together. *Id.*; *Moulder*, No. 20-cr-232, 2022 WL 3644893, at *3 n.2. Addressing the concepts together makes sense here because Abdisalam's motion make no serious attempt to distinguish between them. *See* Dkt. No. 194.

Government would seize the list of items described by Attachment B. Google Warrant at 66–68. The thrust of Abdisalam's argument is that the search warrant violates the Fourth Amendment's particularity requirements by directing Google to disclose the entire e-mail account at step one of Rule 41's two-step procedure. Dkt. No. 194 at 13.

This Court recently rejected an identical particularity argument in another Feeding Our Future case. *United States v. Jama*, No. 22-cr-225, 2024 WL 5381447, at *3–6 (D. Minn. Nov. 21, 2024), *R. & R. adopted by* 2025 WL 227296 (D. Minn. Jan. 17, 2025). Rather than restating its analysis here, the Court incorporates its prior analysis by reference. *See id.*

Abdisalam also takes aim at the e-mail search warrant's date range—January 1, 2020 to present—contending that the warrant affidavit fails to set forth probable cause to seize e-mails from January 2020. Dkt. No. 194 at 13–14. The Court is not persuaded. To start, although this spoke of the fraud scheme began in late 2020, *see* Google Warrant ¶ 33, the Feeding Our Future fraud scheme as a whole began in April 2020 (around the beginning of the COVID-19 pandemic), *id.* ¶ 18. And "it is important to keep in mind that relevant evidence in conspiracy cases often includes not just what the co-conspirators did after the conspiracy came into existence, but also how it was formed in the first place. . . . It follows, during the investigation phase, that probable cause often will exist for the search and seizure of evidence pre-dating the first allegedly unlawful transaction. *United States v. Wendt*, 676 F. Supp. 3d 712, 736–37 (S.D. Iowa 2023). The name of the e-mail account—inspiringyouthoutreach@gmail.com—also supports the search warrant's broad date range. Given that the warrant affidavit alleges Abdisalam created Inspiring Youth to further the fraud scheme, it is reasonable to infer the same is true for

the at-issue e-mail account. That would make it fairly likely that e-mails from as far back as the account's creation (presumably in 2020 or early 2021) would be fairly likely to contain evidence of a crime. Simply put, the request for e-mails as far back as early 2020 was reasonable here.

Regardless, even if the date range was overly broad, the invalid portion of the warrant would be severable. *Wendt*, 676 F. Supp. 3d 712 at 737. Thus, the remedy would be the exclusion of evidence falling within the invalid portion, not suppression of all evidence seized pursuant to the warrant. *Id.* Even assuming, for example, that the warrant affidavit only established probable cause to seize e-mails from October 2020 to present, Abdisalam does not describe what communications and information from 2020 (if any) were seized by the Government during its execution of the search warrant for inspiringyouthoutreach@gmail.com. Therefore, the Court recommends Abdisalam's motion to suppress based on particularity and overbreadth be denied.

## V.    *Leon* Good Faith Exception

Even if Defendants' arguments fared better, the good-faith exception would apply. Under the good faith exception to the Fourth Amendment's warrant requirement, "disputed evidence will be admitted if it was objectively reasonable for the officer executing the search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." *United States v. Mayweather*, 993 F.3d 1035, 1041 (8th Cir. 2021). "The operative test is whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." *Id.* (cleaned up). There are four recognized limits to the good faith exception. The exception will not apply

(1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007) (citing *United States v. Leon*, 468 U.S. 897, 921 (1984). As with warrant analysis is general, courts consider the totality of the circumstances in determining whether a law enforcement officer's reliance on the warrant was in good faith. *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007).

Defendants primarily argue that Agent Wilmer made knowing false statements or reckless omissions. *See* Dkt. No. 188 at 8–25; Dkt. No. 194 at 16–33; Dkt. No. 209 at 7–23; Dkt. No. 214 at 6–24. The Court has already explained why Defendants failed to identify any false statements or reckless omissions. Supra, Part II.

Abdisalam also argues—in relation to his particularity argument—that the "*Leon* good faith [exception] does not apply to a facially invalid warrant where the warrant on its face is devoid of any restrictions on the seizure, as was authorized here." Dkt. No. 194 at 15. This is not persuasive. Courts across the country have differed on when (and whether) a warrant directing the disclosure of an e-mail account at step one violates the Fourth Amendment's particularity requirement. This disagreement is "strong evidence: that any error would not have been obvious. *United States v. Kienast*, 907 F.3d 522, 529 (7th Cir. 2018). Moreover, it was reasonable for officers to presume that the issuing magistrate is aware of the applicable law and rely in good faith on that magistrate's judgment. *Jama*,

2024 WL 5381447, at *6, *R. & R. adopted by* 2025 WL 227296. The Court recommends Defendants' motions to suppress be denied.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED**:

1.     Defendant Ikram Yusuf Mohamed's Motion to Suppress Search Warrant Evidence & for *Franks* Hearing (Dkt. No. 188) is **DENIED** to the extent Ikram requests a *Franks* hearing;

2.     Defendant Shakur Abdinur Abdisalam's Motion to Suppress Search Warrant Evidence & for *Franks* Hearing (Dkt. No. 193) is **DENIED** to the extent Abdisalam requests a *Franks* hearing;

3.     Defendant Suleman Yusuf Mohamed Motion for a *Franks* Hearing (Dkt. No. 208) is **DENIED**; and

4.     Defendant Aisha Hassan Hussein's Motion to Suppress Evidence Obtained by Search and Seizure and for *Franks* Hearing (Dkt. No. 214) is **DENIED** to the extent Aisha requests a *Franks* hearing.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS that:

1.     Defendant Ikram Yusuf Mohamed's Motion to Suppress Search Warrant Evidence & for *Franks* Hearing (Dkt. No. 188) be DENIED to the extent Ikram moves to suppress;

2.     Defendant Shakur Abdinur Abdisalam's Motion to Suppress Search Warrant Evidence & for *Franks* Hearing (Dkt. No. 193) be DENIED to the extent Abdisalam moves to suppress;

3.      Defendant Suleman Yusuf Mohamed's Motion for a Suppression of Evidence (Dkt. No. 207) be DENIED; and

4.      Defendant Aisha Hassan Hussein's Motion to Suppress Evidence Obtained by Search and Seizure and for *Franks* Hearing (Dkt. No. 214) be DENIED to the extent Aisha moves to suppress.

Dated: February 2, 2026                          __s/ David T. Schultz_____
                                                                  DAVID T. SCHULTZ
                                                                  United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).